J-S41035-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| TOM MALINICH | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| HALEY HEISTAND | : | |
| | : | |
| Appellant | : | No. 625 MDA 2022 |

Appeal from the Order Entered March 17, 2022
In the Court of Common Pleas of Cumberland County Civil Division at
No(s):  2018-09660

BEFORE:   LAZARUS, J., MURRAY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:              **FILED FEBRUARY 15, 2023**

Haley Heistand ("Mother") appeals from the March 17, 2022, order entered in the Court of Common Pleas of Cumberland County, which granted shared legal and physical custody of the parties' biological minor son, B.T.M., to Mother and Tom Malinich ("Father").  After a careful review, we affirm.

The relevant facts and procedural history are as follows: On September 21, 2018, Father filed a complaint seeking shared legal and physical custody of B.T.M., who was born in August of 2018.  The parties were never married.  During a conciliation conference, the parties reached a temporary agreement, and the trial court entered an *interim* order on October 31, 2018, holding that the parties shall have shared legal custody of B.T.M., Mother shall have

_____

[*] Former Justice specially assigned to the Superior Court.

primary physical custody of B.T.M., and Father shall have partial physical custody.

Thereafter, Mother filed a contempt petition and a petition for clarification due to alleged changes in Father's work schedule. Following a conciliation conference, the parties could not reach an agreement. Thus, on January 17, 2019, the trial court filed an *interim* order pending a hearing. The order continued to provide for the parties to share legal custody of B.T.M. Mother continued to have primary physical custody while Father had partial physical custody. The order recommended the parties attend therapeutic family counseling.

Thereafter, the trial court held a hearing, and on July 5, 2019, the trial court entered a custody order confirming shared legal custody with Mother having primary physical custody subject to Father's partial custody on Saturday at 9:00 a.m. through Sunday at 6:00 p.m. to be extended to Monday at 6:00 p.m. if Monday falls on a holiday when Father's work is closed. The trial court's order directed that custody exchanges were to occur at the Hampden Township Police Department.

On December 12, 2019, Mother filed petitions for emergency relief and modification of the custody order. The trial court denied the emergency relief petition on December 18, 2019; however, the trial court referred the petition for modification of custody for conciliation. On January 3, 2020, a conciliation conference was held at which the parties agreed that Father's one overnight

would be changed from Saturday night to Sunday night; however, Father requested the case be scheduled for a hearing so that he could pursue additional periods of physical custody. The trial court entered an *interim* order on January 17, 2020, reflecting the parties' *interim* agreement as to the modification of Father's overnight period of physical custody.

The trial court held pre-trial conferences and ordered the parties to participate in co-parenting counseling. The counseling did not resolve the parties' issues. On September 25, 2020, the trial court appointed Adam R. Deluca, Esquire, as guardian *ad litem* for B.T.M.,[1] as well as amended Father's partial custody to Sunday at 3:00 p.m. to Tuesday at 6:30 p.m. with custody exchanges still occurring at the police station.

On October 29, 2020, following a status conference, the trial court entered an order implementing a 50/50 shared physical custody arrangement. During the first week, Father had custody of B.T.M. from Sunday at 5:00 p.m. to Wednesday at 5:00 p.m., and during the second week, Father had custody of B.T.M. from Sunday at 5:00 p.m. to Thursday at 5:00 p.m. This resulted in Father having physical custody of B.T.M. for seven overnights every

---

[1] We note "[t]he court may, on its own motion or the motion of a party, appoint a guardian *ad litem* to represent the best interests of the child in a custody action." Pa.R.C.P. No. 1915.11-2(a). Further, "[t]he guardian *ad litem* shall attend all proceedings and be prepared to testify." Pa.R.C.P. No. 1915-11-2(b).

fourteen days. On November 12, 2020, the trial court amended the October 29, 2020, order to include a custody schedule for holidays.[2]

On January 20, 2021, following a status conference, the trial court directed the parties to engage in individual bi-weekly counseling sessions. Following an additional status conference, the trial court directed the parties to continue with counseling sessions, as well as directed the parties to obtain medical documentation regarding B.T.M.'s recurrent ringworm.

On March 14, 2022, the trial court held a custody hearing at which Mother and Father were present and represented by counsel. Attorney DeLuca appeared as the guardian *ad litem* for B.T.M.

At the hearing, Breanne Smith, who is a casework supervisor with York County Children and Youth Services ("the Agency"), testified that on January 8, 2022, the Agency received a General Protective Services ("GPS") report containing allegations of abuse. Specifically, the report indicated B.T.M. had a bruise on his right bicep. Ms. Smith testified Father reported B.T.M. sustained the bruise when he fell while running. N.T., 3/14/22, at 6-7.

_____

[2] The November 12, 2020, holiday schedule provides for the parties to have periods of physical custody of B.T.M. on major holidays, including Easter, Memorial Day, Independence Day, Labor Day, Halloween, Thanksgiving, Christmas, and New Year's Eve. The holiday schedule rotates yearly so that, over a two-year time span, each party has the same periods of custody on major holidays. One exception is that Mother has custody of B.T.M. on Mother's Day every year while Father has custody of B.T.M. on Father's Day every year.

The Agency investigated the allegations. Specifically, a caseworker viewed B.T.M. on January 9, 2022, while he was in Father's custody. *Id.* B.T.M. refused to show his arm to the caseworker. *Id.* The Agency determined that, while in Father's care, B.T.M.'s needs all appeared to be met. *Id.* On January 26, 2022, the caseworker attempted to follow up with a home visit at Mother's home; however, Mother was not available. *Id.* The Agency contacted Mother and arranged for a home visit on February 10, 2022, at which Mother and B.T.M. were present. *Id.* Ms. Smith testified the Agency staff "attempted to talk to [B.T.M.] and [B.T.M.] was not able to provide yes or no answers, but they did not feel that [B.T.M.] was unsafe in that setting." *Id.* at 8.

Upon questioning by the trial court, Ms. Smith clarified that, although the Agency received a GPS report, the Agency neither conducted a child abuse investigation under the Child Protective Services Law nor implemented any safety plans. *Id.* at 9. She further clarified that, during the home visit with Father, the Agency noted no concerns. *Id.* In fact, the Agency "invalidated the investigation and closed the referral out…on February 17th of 2022[.]" *Id.* Ms. Smith indicated the Agency had no involvement with the family prior to the 2022 GPS report. *Id.* at 10.

Mother presented the testimony of Dr. Laurie S. Pittman, who has been the co-parent counseling coach for the parties since September 1, 2021. *Id.* at 13. Dr. Pittman testified she "started out with them parallel coaching

because they were so divided at first. [They] went to co-parenting coaching as of January 25, 2022." *Id.* She explained parallel coaching involved her meeting with Mother and Father separately while co-parenting coaching involved all three parties meeting together. *Id.* at 14. Dr. Pittman testified she viewed the move to co-parenting coaching as progress between the parties. *Id.* at 13.

Dr. Pittman noted some areas in which the parties have reached an agreement during the co-parenting counseling sessions include making food choices for B.T.M. *Id.* at 15. The parties agreed to "copy" food items offered to B.T.M. in their homes. *Id.* Dr. Pittman explained this was "a major big deal" because it would benefit B.T.M. to have consistency in both homes. *Id.*

Dr. Pittman indicated Father was "very upset" by the fact there was an Agency investigation. *Id.* at 16. Dr. Pittman testified she did not make the referral to the Agency, and she made this clear to Father. *Id.* She noted Father also became upset because Mother was seeking for him to have less physical custody with B.T.M. *Id.* She noted there were times Father attempted to re-hash the parties' problems, and she found it necessary to remind Father that the co-parenting counseling sessions were meant to be about B.T.M.'s well-being and welfare. *Id.*

However, Dr. Pittman noted Father "was the first to actually demonstrate his willingness to show photos [and] videos of what [B.T.M.] was doing [during] his custodial time. And as a result of his role modeling,

[Mother] began to do it as well." ***Id.*** at 17. She noted the parties cooperated in group texting, as well as passed a notebook back and forth between periods of custody so that they would each know "things pertaining to [B.T.M.]" ***Id.***

Dr. Pittman testified she sent letters to the trial court on November 14, 2021, and March 10, 2022. ***Id.*** In the November 14, 2021, letter, Dr. Pittman informed the trial court she was encouraging Mother "to end the assumption that her son is not in good care on Father's time," and encouraging Father "to release thoughts that [Mother] is wishing ill upon him and to focus on his son and not the history of the relationship." ***Id.*** at 18.

Dr. Pittman testified the parties were making progress in her areas of concern until the Agency investigation concerning the bruise commenced. ***Id.*** at 19. She noted this referral "did sort of back slide both of them," as demonstrated by the parties' March 10, 2022, session. ***Id.*** She testified she told the parties that communication between the two of them as to issues regarding B.T.M., such as if he has a fever or an accident, will be key to eliminating future difficulties. ***Id.***

Dr. Pittman testified that a child may benefit from having some disparate parenting approaches, and she informed the parties that different approaches do not "in and of" themselves lead to chaos. ***Id.*** at 19. Rather, it is the lack of communication between the parties that causes the chaos for a child. ***Id.*** at 20.

Dr. Pittman indicated that, during the March 10, 2022, session, Father admitted he was no longer completing passages in the notebook, which the parties were passing back and forth. *Id.* Dr. Pittman indicated that, in her March 10, 2022, letter to the court, she noted that Father is in denial as to how he focuses on his poor relationship with Mother as opposed to doing what is in B.T.M.'s best interest. *Id.* She noted the purpose of co-parenting coaching is not to re-hash the struggles in the parents' relationship but to find mutual ground as it pertains to raising the child. *Id.* at 20-21. She noted Father expressed anger during the March 10, 2022, session, and after he cursed, she ended the session. *Id.* at 21.

She also noted that, in a prior session, on March 2, 2022, B.T.M. shouted "shut up," and Mother spoke up that she did not like that kind of language coming from B.T.M. *Id.* Dr. Pittman testified that, while she explained to the parties that they should try to redirect B.T.M. when he makes such statements, and they should use the barometer of whether a teacher would think the language is appropriate in determining whether B.T.M. needs to be redirected, Father smirked. *Id.* at 22. Dr. Pittman testified she took this as a sign that Father was thinking only in the moment and not thinking forward to how the language or behavior might pose a problem for B.T.M. in the future. *Id.*

Dr. Pittman testified that, during a phone call she had with counsel to discuss the status of the co-parenting counseling sessions, she indicated there

were times Father's mind "goes into like a dark place[.]" *Id.* at 23. For instance, during a group text, he made a unilateral decision on a babysitter for B.T.M. and then told Mother not to "land on the babysitter's doorstep." *Id.* She noted Father's texts sometimes revealed a negative side to Father's mood; however, a few days later, his texts would be warm and engaging. *Id.* She indicated Father would be better served by giving himself time to think before he responds to texts. *Id.*

Dr. Pittman testified that fifty percent of the time Father is focused on B.T.M.'s needs during the co-parenting counseling sessions. *Id.* at 24. She credited Father with being the first to identify that B.T.M. was having a brief period of Encopresis, which involves "going to the bathroom in one's pants." *Id.* at 24-25. She testified the other remaining fifty percent of the time Father is focused on getting Mother to apologize for the parties' difficult history. *Id.* at 25. She indicated that, during the March 2, 2022, session, Father yelled at Mother, and he then "took a time out[.]" *Id.* at 27. Dr. Pittman indicated that, when Father is aware that he is upset before a session occurs, he should reschedule the session. *Id.* at 31. She noted that Father tends to be the "more energetic, physical, playful" parent. *Id.* at 32.

Dr. Pittman noted that Mother has a tendency to be extremely quiet during the co-parenting counseling sessions. *Id.* at 27. She indicated Mother has generally cooperated; however, she "can be very, very quiet." *Id.* at 30. She indicated Mother needs to work on her tendency to negatively look for

possible ailments or accidents, as well as release the mindset that B.T.M. needs protection from Father. *Id.* at 31.

Dr. Pittman noted that, if Father utilizes the notebook effectively and fully discloses when accidents or illnesses occur, Mother would be more likely to "calm down and actually believe, okay, [B.T.M.] is in good hands and Father is caring for [him]." *Id.* at 33. She suggested that good communication could alleviate many of the parenting problems between the parties. *Id.*

Dr. Pittman credited Father for communicating effectively with Mother when B.T.M. vocalized various words, including "house, blue, and…room." *Id.* Father properly reached out to Mother and tried to understand "what could this mean." *Id.* Dr. Pittman testified Mother admitted to Father that she had purchased a new home, and the words may have been related to conversation she and B.T.M. had about the home. *Id.* Dr. Pittman noted it would have been better for Mother to have informed Father that she was purchasing a home prior to doing so. *Id.* She also noted that on another occasion Father effectively reached out to Mother to inquire as to why B.T.M. was saying the word "Stella." *Id.* Mother informed him that it was the name of a character in a television show. *Id.* Dr. Pittman testified Father acted appropriately in reaching out to Mother when he heard B.T.M. say various words so that he could seek clarification about what is occurring in B.T.M.'s life. *Id.*

Dr. Pittman testified that "if both parents could get over their personal difficulties with [Father] thinking he needs to dominate [the] conversation and

Mother learning to speak more fully,…they [could] co-parent[.]" ***Id.*** at 27. She noted Father is often resistant to an idea if it is not his idea, which is an impediment to co-parenting. ***Id.*** at 26. Dr. Pittman testified Mother is suspicious that, during Father's periods of custody, B.T.M. is spending time with his paternal grandparents, as opposed to with Father, and the suspicion is creating problems in the co-parenting relationship. ***Id.*** at 28.

Dr. Pittman testified B.T.M. has been suffering from ringworm, and in November of 2021, she instructed "both households to seek medical treatment" since B.T.M. has been on anti-fungal medication for a year and a half. ***Id.*** at 29. She noted Mother showed documentation that B.T.M. has been treated, as well as provided documentation that Mother's dogs do not have ringworm. ***Id.*** Dr. Pittman indicated she is unsure whether Father or his household have been treated for ringworm. ***Id.***

Dr. Pittman offered the following opinions:

> I truly believe that both parents need to continue to do co-parenting even if it is decided that I am not the one to be the co-parenting coach. They both—this child deserves to have both parents learn how they cannot excoriate the other parent from the child's life; that they need to learn how to embrace the other parent's differences, how they can identify strengths and assets of their child and agree on how to make the most of those, how to identify possible deficits and weaknesses in their child and how to navigate those for the child.
>
> In other words, I think it would rob the child if co-parenting were eliminated from their duties. Parenting is not going away. And they need both to consider how to make the most of the tools they are offered and both of them need to use the tools whether they agree with them or they do not.

*Id.* at 30.

Dr. Pittman testified her recommendations include that the trial court order the parties to write in the notebook, participate in group texts, and set a plan for B.T.M. to participate in brief phone calls with each parent when he is in the custody of the other parent. *Id.* at 35-36. She indicated the brief phone call could be good for B.T.M., as well as the parents. *Id.*

On cross-examination by Father's counsel, Dr. Pittman admitted that Father wrote in the notebook when B.T.M. suffered his bruise on the arm; however, she indicated he was not sufficiently specific about the manner in which the bruise occurred. *Id.* at 36-37. She noted that if Father communicates "the how, the why, and the circumstances" when something occurs, Mother will be more likely to calm down. *Id.* at 37.

Dr. Pittman clarified the session where Father became upset and cursed occurred during the most recent session after the abuse allegation had been made. *Id.* She suggested that Father believed Mother contacted the Agency, and while she could understand why he might be upset, she noted his frustration had no place in the co-parenting counseling session. *Id.* at 37, 39. She indicated it was her understanding that the trial court had previously informed the parties that if unwarranted reports to the Agency or unwarranted PFAs were filed by a party it would affect that party's custodial time negatively. *Id.* Dr. Pittman opined B.T.M. may have sustained the bruise during boisterous play with Father, and such play would not constitute abuse. *Id.* at

38. However, she indicated she never viewed the bruise or met with B.T.M. *Id.* at 39.

Dr. Pittman indicated she was aware Mother repeatedly tried to limit Father's custodial time with B.T.M., and she could understand why this might frustrate Father. *Id.* at 40. However, she noted the co-parenting counseling session was an inappropriate forum for Father to err his grievance about this issue since the objective of such a session is to find ways to communicate for the betterment of B.T.M. *Id.* Dr. Pittman testified that, when she met with the parties' attorneys on February 8, 2022, she informed the attorneys that she "had seen nothing from either party to [warrant] changing custody as it currently stands." *Id.* at 40-41.

On redirect examination by Mother's counsel, Dr. Pittman testified that the maternal and paternal grandparents are well-intentioned people; however, she believes they view the "other parent" as guilty, which might influence B.T.M.'s development. *Id.* at 46.

Upon examination by the trial court, Dr. Pittman indicated she would like to continue co-parenting coaching sessions with the parties. *Id.* The trial court noted the court had no recollection or record of ever directing that parties who made referrals to the Agency or filed PFAs could be in jeopardy of losing custodial time. *Id.* at 47. Dr. Pittman clarified she had never seen any such trial court order but that one of the parties had provided her with such information. *Id.* The trial court stated, "I just wanted to correct the record,

- 13 -

not necessarily your testimony because your testimony is what you have heard or observed." ***Id.***

Attorney DeLuca offered his observations as the court-appointed guardian *ad litem*. Specifically, he testified that, due to B.T.M.'s young age and lack of verbal skills, he has not conducted an interview with him. ***Id.*** at 48. Attorney DeLuca indicated the complaints in this case stemmed primarily from Mother, so he conducted a home visit at Father's home to view the environment and observe Father's interaction with B.T.M. ***Id.*** at 49. He noted everything was "fine," and he observed no concerns. ***Id.***

Attorney DeLuca noted the parties had a brief relationship before Mother became pregnant with B.T.M. and, throughout most of B.T.M.'s life, there have been legal proceedings "looming over this entire thing." ***Id.*** He indicated Mother's main complaint throughout the proceedings has been related to B.T.M. having ringworm. ***Id.*** at 49-50. He noted B.T.M.'s ringworm problem has been "taken seriously by both parties." ***Id.*** at 50. Attorney DeLuca indicated Mother's other complaints relate to B.T.M. having a bruise on his arm, and when B.T.M. was still in diapers, rashes appearing while in Father's care. ***Id.***

Attorney DeLuca indicated Father's main complaints stem from Mother's unwillingness to voluntarily permit a 50/50 physical custody arrangement, which has resulted in the parties engaging in court proceedings. ***Id.*** He noted Father has expressed frustration at having to prove he is "worthy of doing

50/50" custody. *Id.* at 51. Attorney DeLuca suggested "Mother [felt] she had to watch over [B.T.M.] even when she wasn't with him almost as his protector and that she had to do whatever she could to stop him from spending more time with [Father]." *Id.* He indicated progress has been made with Mother realizing she does not have to "protect" B.T.M. from Father. *Id.*

Attorney DeLuca opined that most of the complaints have arisen due to "personal feelings" between the parties. *Id.* He opined the fact the parties have been able to engage in co-parenting coaching sessions with each other "is a huge victory…for both parents[.]" *Id.* He acknowledged Father had a "blowup" during the March 10, 2022, session; however, he suggested there were issues that "triggered" the "blowup," and these issues did not need to occur. *Id.* at 52. Specifically, he indicated:

> I think there were some things that triggered those issues that maybe should not have come up. I heard from [the Agency] basically kind of blow a case off here saying they had a report that there was a mark on a child's arm that looked like a thumbprint. A thumb is an oval.
>
> I mean, I think every bruise my children have ever gotten could say looked like a thumbprint. So, the fact that [the bruise] was reported to [the Agency] is sort of disappointing, and I think taking backward steps in progress that [was] made in co-parenting counseling, which ultimately affects the child.
>
> And as you heard from every professional here so far, [the Agency], Dr. Pittman, there are a lot of things to be done here between [Mother] and [Father] but not necessarily anything directly needing to be done with [B.T.M.] other than improving that relationship which trickles down to the child. So that's the main theme here.

*Id.* at 52.

Attorney DeLuca suggested that, as it relates to the custody factors, which the trial court must consider, the parents have both "done quite a bit" to improve the situation for B.T.M. *Id.* Both parents have seen individual mental health counselors. *Id.* Both parents have addressed their own issues, such as Mother has addressed her negative feelings towards co-parenting, has found ways to fill her time away from B.T.M., and has dealt with the stress of the legal proceedings. *Id.* at 53.

Father's mental health counselor has described Father as "a very motivated and engaged patient, employed, really no theme came up whatsoever in his counseling…that suggested he needed to do any further individual counseling or any medical treatment[.]" *Id.* He noted Father's mental health counselor discharged Father after six sessions because the counselor could see no further reasons for counseling or any mental health issues with Father. *Id.*

Attorney DeLuca acknowledged that, in addition to individual mental heath counseling, the parties participated in co-parenting counseling with Dr. Pittman. *Id.* Attorney DeLuca indicated "Dr. Pittman is not always for everybody. That's been her way or method for her entire career. She can sometimes be difficult to work with." *Id.* However, he indicated she was "pretty even-keeled" as it related to her testimony. *Id.* at 54. He noted that she explained an overall theme of progress between the parties, and it is

important to keep heading in this positive direction since it is in B.T.M.'s best interest. *Id.*

Attorney DeLuca suggested the parties should continue co-parent counseling with Dr. Pittman, write in the notebook, participate in group texts, and permit B.T.M. limited phone calls. *Id.* at 55. He noted that, since B.T.M. was only three years old, a five-minute phone call once during a custodial parent's time to the other parent would suffice. *Id.*

Attorney DeLuca suggested to the trial court that, as it pertained to the custody factors, B.T.M. has no "well-reasoned preference" to be with one parent over the other, particularly given his young age. *Id.* He suggested the main issue will be whether the parents will encourage contact and communication. *Id.* He opined that, since the parents are actively engaged in co-parenting counseling sessions,

> [it is] in the child's best interest [for] the custody schedule to remain the same as it is right now….At this child's age, there's no reason why he should not be seeing both parents an equal amount of time if he is not in any harm and both parents are actively engaging with him, playing with him, and helping him, which by all accounts seems to be the case.

*Id.* at 56.

Attorney DeLuca testified Father works an "overnight schedule." *Id.* He gets home early in the morning, stays awake to spend time with B.T.M., and then sleeps during the midday through evening until he leaves for work. *Id.* He indicated that, although Father does not work a 9 to 5 schedule, he "spends time with his child[,]" just at times different than other working people might

- 17 -

spend the time. *Id.* at 57. He testified that, if the custody exchange times need to be altered because of a parties' job change, that is understandable. *Id.* at 59. He reiterated a "recommendation of a 50/50 custody schedule....The parties need to be able to work on a time change. Everyone's job is going to change in their lifetime." *Id.* Attorney DeLuca testified that he has no concerns about B.T.M.'s "safety at either household." *Id.* at 60.

Mother testified she owns a home and lives with B.T.M. in Harrisburg, Pennsylvania. *Id.* at 62. She has two dogs. *Id.* at 62. She acknowledged she participated in group text messages with Father and Dr. Pittman. *Id.* at 63. She indicated it is "very hard to communicate with [Father]," and she noted he unilaterally chose a babysitter after they had agreed to use a different babysitter for B.T.M. *Id.* at 63. She testified she was concerned because she did not know the "new" babysitter, and Father would not provide any information beyond the fact she was "a neighbor." *Id.* at 65. Mother acknowledged that, within a week after the "new" babysitter began watching B.T.M., Father provided Mother with her phone number. *Id.*

Mother testified she has spoken to the "new" babysitter twice and, during the first phone call, she discovered the babysitter did not know whether B.T.M. had any allergies. *Id.* at 65. She testified the babysitter reported to Mother that she watched B.T.M. from 7:30 a.m. to 3:30 p.m. in Father's home, and she was not giving B.T.M. his ringworm medicine. *Id.* She also claimed the babysitter did not have a car seat, and she did not know the name of

B.T.M.'s pediatrician. *Id.* Mother indicated that, to the best of her knowledge, the "new" babysitter is still watching B.T.M. during periods while he is in Father's custody. *Id.* at 66.

Mother testified that, when she and Father were dating, Father told her he might have "some kind of brain injury" because he used to play football. *Id.* She noted that, in a twitter message, Father stated to someone "I'm done follow you, man, I have enough of my own brain damage from playing football and brain injuries." *Id.* at 67.

Mother acknowledged Father has asked her to settle the custody dispute outside of court. *Id.* However, she refused to do so because one of Father's stipulations was that they would exchange B.T.M. at a park, as opposed to the police station, and spend time together as a trio. *Id.* Mother noted Father has tweeted that he legally smokes marijuana. *Id.* at 68. She also noted Father tweeted on New Year's Eve that he was "drunk," and his resolutions included "killing" anyone who plans to kill an innocent person or engage in any form of sex trafficking. *Id.* at 68. She noted she has concerns about Father's anger. *Id.* at 69. She acknowledged Father "never put his hands" on her; however, she indicated there were times "he ran up" to her, and one time he blocked her exit when she was leaving a pediatrician's office. *Id.* She noted that, on one occasion, he became frustrated with B.T.M. reaching for Mother, so he "flung" B.T.M. around so that he wasn't facing Mother. *Id.*

Mother testified that, to her knowledge, Father has had eleven different jobs since B.T.M. has been born; however, she clarified that some of the jobs were the "same job" where he returned after working somewhere else for a while. *Id.* at 72-73. She noted the changes affected the custody schedule, and she would accommodate Father for him to have custody of B.T.M. during his days off. *Id.* at 73. Mother testified she believes part of the reason the parties needed to have a court hearing is because Father's "current schedule doesn't really match the custody schedule that's in effect." *Id.* at 74.

Mother testified that, some of the time Father has custody of B.T.M., he is working while Mother does not work when she has custody of B.T.M. *Id.* at 74-75. She noted she has texted Father to see if she can have custody when he is working; however, when she has asked, Father either did not answer or B.T.M.'s paternal grandfather would indicate he had plans to spend time with the child. *Id.* at 75.

Mother testified that, back in 2019, there was a time when Father was supposed to bring B.T.M. to the police station at 7:00 a.m. to exchange custody, and Father texted he would not exchange custody until Mother answered his question. *Id.* at 76. Mother testified she could not remember the "exact question," but Father essentially threatened to violate the trial court's order if she didn't answer the question. *Id.* Mother indicated she answered the question so she could get custody of B.T.M. *Id.* She indicated another time Father met her on time at the police station, but he would not

take B.T.M. out of his car until Mother answered whether she had a boyfriend. *Id.* at 77.

She testified another time, shortly after the 50/50 custody schedule was ordered, Father originally agreed to let her have "extra" time with B.T.M. when Father was at work; however, he changed his mind and would not let Mother watch B.T.M. while he was working. *Id.* at 78. Mother noted the October 29, 2020, court order encouraged, but did not require, the parties to use each other as a resource if child-care was needed. *Id.* at 79. She indicated she has asked Father to watch B.T.M. instead of using a babysitter while Father is working, but Father either did not reply to her text, indicated no, or indicated the paternal grandfather had plans with B.T.M. *Id.*

Regarding the bruise on B.T.M.'s arm in January of 2022, Mother acknowledged she did not initially notice the bruise when Father returned custody of B.T.M. to her, and Father broached the issue during a co-parenting counseling text. *Id.* at 80. Specifically, Father asked Mother how B.T.M.'s arm looked and noted he had sustained a bruise when he fell while running. *Id.* Father texted that B.T.M. was pretending to be "Spiderman" when he was running. *Id.* In the text, Dr. Pittman encouraged Father to set more boundaries for B.T.M., and Father responded he would play with B.T.M. "the way [he's] always been." *Id.* at 81.

Mother testified B.T.M. started having ringworm issues when he was fourteen months old, and it started after he began having overnight visits with

Father. *Id.* She indicated the pediatrician's records reveal that Father denied having any active rashes but reported having occasional rashes during times of stress. *Id.* at 82. The pediatrician recommended Father see a dermatologist so that B.T.M. doesn't get Father's rashes. *Id.* Mother testified she once saw a ringworm rash on Father. *Id.* The last time B.T.M. had ringworm was on October 21, 2021. *Id.* at 82-83. Mother indicated she took her dogs to the veterinarian, and there were no signs of her dogs ever having ringworm. *Id.* at 82.

Mother testified that, on one occasion during the summer of 2021, B.T.M. returned to her custody with a sunburn, which took five days to get better. *Id.* at 83. She texted Father to determine how B.T.M. received the sunburn, and Father denied that B.T.M. had a sunburn. *Id.* Mother testified B.T.M. has his own bedroom and playroom in her house. *Id.* at 84. She has the rooms decorated with dinosaurs. *Id.* at 84.

Mother testified she believes it is in B.T.M.'s best interest for him to be with his parents when they are available. *Id.* She explained that, since Father does not work from Tuesday at noon until Thursday at 7:00 p.m., at which time he goes to sleep and wakes up for work the next day, she would like a custody schedule where Father has custody of B.T.M. from Tuesday at noon to Thursday at 7:00 p.m. to maximize "both of [their] times" with B.T.M. *Id.* at 84-85. She would also like a holiday schedule based on times they work. *Id.* at 84-85. She noted she works in the construction field, and she never

works on Fridays or weekends; however, Father works during the weekend and doesn't get home until around 11:30 a.m. to noon on Sunday. *Id.* at 85-86. She would like to split Sunday between the two of them so that they both can spend time with B.T.M. when they are not working on Sunday. *Id.*

Mother testified her proposed schedule would not take time away from Father; but rather, she would be maximizing the time he is physically at home with B.T.M. *Id.* She suggested the current custody schedule results in Father spending only a "handful" of awake time with B.T.M. with B.T.M. spending the rest of the time with other people, including primarily the paternal grandparents. *Id.* She noted that, during 24 hours of custody, Father only spends about six or seven awake hours with B.T.M., and the remaining time B.T.M. is with his paternal grandparents. *Id.* Since she is available, it would make sense to let her have custody during the time Father is at work. *Id.* Alternatively, she would adjust the overnights so that Father has B.T.M. when he is awake and not at work. *Id.* at 86. She testified she should have priority over the paternal grandparents, who spend time with B.T.M. when Father is working or sleeping. *Id.*

Mother testified the co-parenting counseling sessions are going "okay[.]" *Id.* at 87. She tries to follow Dr. Pittman's recommendations because she thinks it is important for the parties to co-parent; however, Father brings up the past and is sometimes disrespectful towards her. *Id.* Mother testified she wants to move forward, and she would like to continue

co-parenting counseling sessions with Dr. Pittman. *Id.* at 88. She would like the trial court to include in future court orders that writing in the notebook and phone calls with B.T.M. are mandatory. *Id.* Mother testified the reason there has been extensive litigation in this case is because the parties' schedules keep changing, and they are unable to work with each other to find a solution. *Id.*

On cross-examination, Mother clarified she purchased her new home in a different county on November 5, 2021. *Id.* She admitted she did not tell Father that she was moving with B.T.M. until December 21, 2021. *Id.* at 89. She testified she did not immediately tell Father about the plan to move to a different county because she "just didn't think about it." *Id.* Mother admitted she knows Father is off from work on Wednesdays and Thursdays; however, she did not reach out to him to suggest changing the current custody schedule so that he has B.T.M. on those days off. *Id.* at 89-90.

Mother acknowledged that, in January of 2020, the trial court had the recommendation in place that, when parties are working and need child-care, they should seek to allow the other parent to have time with B.T.M. *Id.* at 90. On January 13, 2020, Father asked Mother who was watching B.T.M. because he wanted to pick up B.T.M. since he was not working, and while Mother answered the text, she refused to answer Father's question. *Id.* at 91.

Regarding the bruise on B.T.M.'s arm, Mother testified it looked like a thumbprint, but she doesn't think Father would have done such a thing

intentionally. *Id.* Despite proposing a custody schedule that would give Father only two days per week of physical custody, instead of the current 50/50 custody schedule, Mother denied seeking to decrease Father's custodial time with B.T.M. *Id.* at 92. She testified she is trying to maximize the time B.T.M. is actually with Father instead of with the paternal grandparents. *Id.*

At this point, the trial court noted that Mother's exhibits related to text messages were primarily from 2019 and 2020. *Id.* Mother responded that texts between her, Father, and Dr. Pittman were from 2021, and the text related to the bruise was from 2022. *Id.* The following relevant exchange occurred between the trial court and Mother:

Q: The bruise that you don't believe is an intentional bruise?
A: No.
Q: So, what was the point of presenting that as an exhibit if you don't think he intentionally harmed the child?
A: This is just how [B.T.M.'s] body looked.
Q: You agree that toddlers get bruises?
A: I do. I do. And he's a wild one, so he does get bruises often. But this one looked a little different than his normal weekly bruises.
Q: Do you know who called Children and Youth in York County?
A: I do.
Q: Who?
A: My mom.
Q: Were you present when she called?
A: I was not.
Q: How did you find out she called?
A: We had spoken about it.
Q: How did she find out about the bruise?

- 25 -

A: Text messages and pictures.

Q: So, you sent your mother text messages and pictures about this bruise on [B.T.M.'s] arm—

A: Yes.

Q:--that you did not believe [Father] intentionally caused?

A: Yes.

Q: So, what's the point of all of that?

A: Just to show how [B.T.M.'s] body looked. And [Dr. Pittman] got these pictures as well in our group text messaging.

Q: Have you ever called Children and Youth Services on the father?

A: I have not. The pediatrician has.

Q: That wasn't my question.

A: I have not.

Q: Is it fair to say that it's been approximately six months since [B.T.M.] has had any issues with skin conditions, ringworm or other skin—like fungal skin conditions?

A: I thought—here it will tell me.  Whenever [Father] had texted about [the new babysitter] at first, that's the last time he had it because he was on medication then.  So that was October of 2021.  That was the last time [B.T.M.] had gotten it.  This time, yes.

Q: Would it be fair to say he may have been for that incident in September of 2021, which is what the doctor's letter says?  He may have still been on the medication?

A: [B.T.M.]?

Q: Right.

A: Yes. Yes. [B.T.M.] was on the medication in October 2021, and that normally lasted like one to three months depending on when it clears up.

Q: Just so I understand your testimony, because you presented an exhibit showing that the father's employment has changed several times over the last—since 2018, correct?

A: Correct.

Q: I assume that those changes of employment have some schedule changes?

A: [Father's] schedule changes, correct.

Q: Yes. So, it's your testimony that the child's schedule should just keep—it is your position, I'm sorry, that the child's schedule should—custody schedule should just keep changing in accordance with the parents' work schedules and there shouldn't be a consistent schedule?

A: I believe that there should be consistency, but I also believe that [B.T.M.] should be able to be with a parent like on their days off so it's consistent time.

*Id.* at 93-96.

When the trial court posed a hypothetical of whether Mother would want Father to have 50/50 physical custody of B.T.M. if he were to stop working and have an "abundance of free time," Mother answered, "do I believe 50/50, no, I don't." *Id.* at 96. She testified "I don't believe 50/50 for [B.T.M.] is the best for [B.T.M.] right now as a three-year-old." *Id.* at 97. She further testified "I believe when [B.T.M.] gets older he will want to be with [Father] more. I believe that since [B.T.M.] is younger right now that he may need his mom more." *Id.*

Father testified he lives with his parents in Mechanicsburg, Pennsylvania, and B.T.M. has his own bedroom, as well as a playroom in the basement. *Id.* at 98-99. Father testified he is currently employed at the Horseshoe Casino in Baltimore, Maryland. *Id.* at 99. He works 2:00 a.m. to 10:00 a.m. on Friday, Saturday, Sunday, Monday, and Tuesday. *Id.* at 100. Approximately two nights per week, he gets to leave work early because business is slow. *Id.* When he is working, B.T.M.'s paternal grandparents

watch him, and if they are unable to do so, Father has a babysitter on standby. *Id.* at 101.

Father testified that, generally, on the days he has custody of B.T.M., Father goes to sleep at 7:00 p.m. with B.T.M. following behind him at 8:00 p.m. *Id.* Father wakes up at midnight and leaves for work at 12:30 a.m. *Id.* He indicated that he works while B.T.M. sleeps. *Id.* at 102. Father testified he has no plans to change his employment now that he is working in the casino. *Id.*

Father testified he believes he, as opposed to Mother, will be more likely to encourage and permit frequent and continuing contact with the other parent. *Id.* He noted he has multiple resources to assist him in picking up and dropping off B.T.M. for custody exchanges. *Id.* He testified Mother has intentionally tried to interfere with him being a father to B.T.M. since the day B.T.M. was born. *Id.* He noted that, before B.T.M. was born, Mother tried to get him to relinquish his parental rights, and she refused to list Father's name on B.T.M.'s birth certificate despite the fact there is no dispute that he is the biological father. *Id.* at 104. He testified he asked Mother to take steps to amend the birth certificate to include him as B.T.M.'s biological father, but she failed to do so. *Id.* at 105. He noted this omission from the birth certificate has resulted in Father not being able to get B.T.M. health coverage through Father's employer. *Id.*

Father testified he filed for custody of B.T.M. almost as soon as he was born because Mother told him B.T.M. would not be able to stay overnight with him until he was at least three years old. *Id.* at 106. Father testified Mother has made numerous efforts to prevent him from having a normal parental relationship with B.T.M. *Id.*

Father confirmed he has never been abusive towards Mother or B.T.M. *Id.* He noted Mother has reported that she is fearful of Father; however, she has never provided any reason or basis for this alleged fear. *Id.* Father indicated Mother and her family members have come to his place of employment and "told him off." *Id.* at 107. Father testified he and Mother have had a shared physical custody schedule for quite some time, and he takes care of B.T.M. *Id.* at 109. He has taken B.T.M. to his doctor's appointments, the bakery, and to visit family members. *Id.* He performs normal parental duties when he has custody of B.T.M. *Id.* His extended family lives primarily in Mechanicsburg. *Id.* at 111.

Father indicated he has had a few different jobs since B.T.M.'s birth so that he can continue paying his bills, including child support. *Id.* at 110. He has no other children, B.T.M. has shown no concerning behavior while he is in Father's custody, and they have a normal relationship. *Id.* at 112. He testified he is worried Mother will try to turn B.T.M. against him, particularly once B.T.M. is able to communicate verbally. *Id.* at 113. He noted he believes he is able to maintain a loving, stable, and consistent relationship with B.T.M.

since he has good parenting instincts and wants to take care of B.T.M. *Id.* He also indicated he takes care of B.T.M.'s daily, physical, and emotional needs. *Id.* at 114. He noted he spends most of his free time with B.T.M. during his custodial time, and they are very active together. *Id.* He runs with him, watches Mickey Mouse with him, and reads to him. *Id.* Regarding punishment, Father testified that, if necessary, he tells B.T.M. to go to his room. *Id.* at 115. He noted he has not had to discipline B.T.M. that often since he continuously communicates and interacts with B.T.M. so he understands what is safe and not safe. *Id.*

Father testified his residence in Mechanicsburg is approximately thirty-five minutes from Mother's current residence. *Id.* He indicated Mother lived closer to his residence before she moved in December. *Id.* He explained the reason he switched babysitters was because Mother would often call the "old" babysitter and "pepper" her with questions about Father. *Id.* This made Father feel uncomfortable, so he found a "new" babysitter. *Id.* He noted he was acquainted with the "new" babysitter before B.T.M. was born. *Id.* Father testified that, in any event, one of his parents is generally available to care for B.T.M. if Father is not available. *Id.* at 117.

Father testified he believes the level of conflict in the custody case is "high," and he recognizes Mother thinks he has an anger management problem. *Id.* Father indicated he does not have a problem with anger; however, he is angry that Mother accuses him of being a bad parent without

any basis. *Id.* at 118. Father testified he does not think the co-parenting counseling sessions are helpful since Mother is quiet and he is the one who does most of the talking. *Id.* When he tries to express to Dr. Pittman that he is frustrated by Mother's unfounded abuse accusations, she tells him to stop living in the past without seeking a resolution. *Id.* at 119. He explained he is hesitant to write in the notebook because Mother seems to always be looking for ammunition. *Id.* He testified he has always spoken freely during sessions with Dr. Pittman, and he is disappointed that she has summed up his expression of frustration as "he has anger issues." *Id.* at 120.

Father testified he does not have a history of drug or alcohol abuse, he has no mental health issues, and he has no criminal record. *Id.* He noted he has a valid, legal prescription for marijuana, which he uses on occasion when he does not have custody of B.T.M. *Id.* at 121. Father testified his statements on twitter regarding him having a brain injury from football was "dark humor." *Id.* He noted he played football for fifteen years, and he will not be letting B.T.M. play football as it is too rough on one's body. *Id.* He has no symptoms of a brain injury, and he noted that his individual mental health counselor discontinued services after six or eight sessions because the counselor determined his services were not necessary. *Id.* at 122.

Father testified he would like the trial court to make the custody "drama" stop and retain the 50/50 shared physical custody arrangement. *Id.* at 123. He suggested he would like to change his custodial times slightly so that he

has B.T.M. from Sunday at noon to Wednesday at noon the first week and Sunday at noon to Thursday at noon the second week to accommodate his work schedule. *Id.* at 137. He noted he just wants to be a father. *Id.* He also asked that the co-parenting counseling sessions cease. *Id.*

On cross-examination, Father testified the reason he wanted to exchange custody of B.T.M. in the park was so that B.T.M. could see him and Mother getting along in a healthy manner. *Id.* at 124. He explained that, from his perspective, the co-parenting counseling sessions have been a professional environment where Mother can blame him for all problems. *Id.* Father testified he is ready to live his life as a "normal" parent without constant supervision by a counselor or the court. *Id.* at 128. Father noted that, at the most, B.T.M. spends three of his waking hours each day with someone other than Father on the days Father has custody. *Id.* at 130-31. He reiterated that most of the time he is working B.T.M. is sleeping. *Id.*

Upon examination by the trial court, Father reiterated that he would like co-parenting counseling sessions to cease. He explained he believes he and Mother can communicate through text messages without a counselor being involved. *Id.* at 132. Father informed the trial court the grandparents are currently doing the custody exchanges, and for some unknown reason, Mother's family is videotaping the exchanges. *Id.* at 134. Father testified he is hopeful he and Mother can get along. *Id.*

At the conclusion of the hearing, the trial court indicated that "based upon the evidence and testimony" it would make its findings as to the sixteen custody factors. *Id.* at 141. The trial court then indicated the following:

So, as far as Factor one, which party is more likely to encourage and permit frequent and continuing contact between the other party. I found that Mother's past history has demonstrated that she does not encourage and permit frequent contact between Father and child.

And Mother initially testified to a proposed custody schedule that would maximize each parent's time by having the child with Father when it was his day off and having the child with her when she was not working. Yet, when asked if Father stopped working and had ample time for a 50/50 custody schedule if that would changer her position to allowing for 50/50, and she said no.

She explained that she believes a three-year-old needs to be with their mother more and as the child gets older he will want to be with his father more. Mother continues to be unable to encourage ongoing and frequent contact between the father and child without a reasonable basis and, therefore, this factor favors Father.

Present and past abuse committed by either party or a member of the party's household whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of child, there is no incredible [*sic*] evidence of abuse presented at the hearing; however, the testimony of the co-parent counselor concerning Father's emotional stability is cause for concern and reiterates the need for continued co-parent counseling. This factor favors the mother.

The parental duties performed by each party on behalf of the child, the evidence presented demonstrated that each party performs parental duties when the child is in their care; however, Mother has traditionally had more time with the child and has been the primary caretaker over the course of the child's life with regard to medical appointments. This factor favors Mother.

The need for stability and continuity in the child's education, family life, and community life, Father's frequent employment changes have resulted in the need for adjustments to the custody

schedule which, in turn, results in changes in the child's routine. For this reason, this factor favors Mother.

The availability of extended family, there is limited evidence in this regard; however, I believe that both parties have parents in the general area, and, for that reason, this factor is equal.

The child's sibling relationships, there are no sibling relationships, so this factor is not applicable.

The well-reasoned preference of the child based on the child's maturity and judgment, the child is three years old, and therefore, does not have a well-reasoned preference. The Guardian *Ad Litem* testified concerning his lengthy involvement with the case over several years. Based on all the information he has gathered, he is unable to identify a reason the child should not be seeing his parents on a 50/50 custody schedule.

His recommendation is that it is in the best interest of the child that the current 50/50 physical custody schedule continue, and the parents work on their co-parenting relationship. This factor is equal and is in favor of a 50/50 custody schedule.

The attempts of a parent to turn the child against the other parent except in cases of domestic violence, Mother has attempted to thwart the development of a strong, healthy relationship between Father and the child. The recent Children and Youth Service referral was clearly unnecessary and was a result of Mother disseminating pictures of a bruise to third parties. This factor favors Father.

Which party is more likely to maintain a loving, stable, consistent, and nurturing relationship with the child, adequate for the child's emotional needs, both Mother and Father are capable of maintaining a nurturing, stable relationship with the child that meets the child's emotional needs; however, there was evidence presented that Mother recently took pictures of the child's body and sent the pictures to the co-parent counselor and maternal grandmother.

Mother maintains now that she did not have a concern that Father had harmed the child, yet her actions tell a different story. As the child ages, placing him under this type of an intense microscope whenever he returns from Father's care will begin to negatively impact the child emotionally, if it has not already. This factor favors Father.

Which party is more likely to attend the daily physical, emotional, developmental, educational, and special needs of the

child, Mother clearly believes that she is better able to meet the child's needs, yet she did not present credible evidence to support this. The credible evidence suggests that both parents are able to attend to the child's daily needs. This factor is equal.

The proximity of the residences of the parties. Mother moved further away from Father and did not tell Father of her change in residence in a reasonable amount of time. And for that reason, this factor favors Father.

Each party's availability to care for the child or ability to make appropriate child-care arrangements, while there was significant time spent on evidence related to child-care arrangements, no one presented evidence that the child-care currently provided or previously provided was inappropriate. For that reason, this factor is equal.

The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another, the level of conflict between the parties remains high, despite that they were able to progress from a parallel parenting to a co-parent counseling.

Both parents share responsibility in the ongoing conflict, and professional counseling is required to assist them in this regard. There was evidence of Father's recent inappropriate communications with both Mother and the co-parent counselor. And he was unwilling to own these inappropriate communications and asked that co-parent counseling cease. For that reason, this factor favors Mother.

The history of drug and alcohol abuse of a party or member of a party's household, there was no credible evidence presented on this factor, and for that reason, this factor is not applicable.

The mental and physical condition of a party or a member of a party's household, the conditions of the household of both are sufficiently adequate to meet the needs of the child. This factor is equal and any other relevant factor.

The co-parent counselor did not and is not able to provide custody recommendations. She talked about overall progress she had made with the parties, which included that she was able to get them from parallel parenting sessions to co-parenting sessions. While she identified recent setbacks, March 2nd, 2022, and March 10th, 2022, involving Father's outbursts and frustration that stemmed from [an Agency] referral made by maternal

grandmother, she did not recommend that co-parent counseling cease.

She believes co-parent counseling is needed and remains willing to provide it. For that reason, this factor weighs in favor of co-parent counseling and continuing co-parent counseling with Dr. Pittman.

Based upon these 16 factors, my ruling is to maintain a 50/50 custody schedule. I've made an alteration in that custody schedule from the October of 2020 order. If neither parent likes the alteration, then you guys are welcome to come to an agreement to change it.

Week 1 will be Father from Sunday at 5:00 p.m. until Thursday at 5:00 p.m. with Mother from Thursday at 5:00 p.m. to Monday at 5:00 p.m. Week 2 will be Father from Monday at 5:00 p.m. until Thursday at 5:00 p.m. Mother is Thursday at 5:00 p.m. until Sunday at 5:00 p.m.

*Id.* at 141-147.

The trial court memorialized its findings and holdings in a court order, which was filed on March 17, 2022. The trial court noted the holiday schedule as ordered on November 12, 2020, would remain in effect.

Mother filed a timely notice of appeal, as well as a contemporaneous statement of matters complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i). The trial court filed a responsive Pa.R.A.P. 1925(a) opinion on June 17, 2022.

In her first issue, Mother contends the trial court abused its discretion as it relates to its consideration of B.T.M.'s best interests under the sixteen custody factors set forth in 23 Pa.C.S.A § 5328(a). Specifically, she contends the trial court failed to give adequate consideration to the following: (1) Father's emotional stability and the "dark places" to which his mind goes; (2)

The possibility that Father suffers from traumatic brain injury; (3) Father's refusal to cooperate with co-parenting counseling or follow the co-parenting counselor's recommendations; (4) Father's numerous violations of the court order; (5) Father's inability to manage his anger or filter inappropriate remarks; (6) The lack of consistency in Father's work schedule; (7) Father's inability to exercise custody for much of his scheduled custody period due to his overnight work schedule; (8) Instances of Father permitting paternal grandfather, as opposed to Mother, to care for the child when Father is working; and (9) Father's inability to take appropriate action to prevent the subject child from contracting ringworm.

Initially, we note that when reviewing a custody decision by the trial court, our scope of review is of the broadest type and our standard of review is an abuse of discretion. *See D.K. v. S.P.K.*, 102 A.3d 467, 478 (Pa.Super. 2014). This Court will not find an abuse of discretion "merely because a reviewing court would have reached a different conclusion." *In re K.D.*, 144 A.3d 145, 151 (Pa.Super. 2016).

> We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable finding of the trial court.

***D.K.***, 102 A.3d at 478 (citation omitted).

> We have stated:

> The parties cannot dictate the amount of weight the trial court places on evidence. Rather, the paramount concern of the trial court is the best interest of the child. Appellate interference is unwarranted if the trial court's consideration of the best interest of the child was careful and thorough, and we are unable to find any abuse of discretion.

***A.V. V. S.T.***, 87 A.3d 818, 829 (Pa.Super. 2014) (citations omitted).

In addition to our deference to the trial court's credibility and weight determinations, we are mindful that "it is within the trial court's purview as finder of fact to determine which factors are most salient and critical in each particular case." ***M.J.M. v. M.L.G.***, 63 A.3d 331, 339 (Pa.Super. 2013) (citations omitted). Most important, in any custody action under the Act, the paramount concern is the best interest of the child. ***See*** 23 Pa.C.S.A. §§ 5328, 5338.[3] "The best-interests standard, decided on a case-by-case basis, considers all factors which legitimately have an effect upon the child's physical, intellectual, moral, and spiritual well-being." ***D.K.D. v. A.L.C.***, 141 A.3d 566, 572 (Pa.Super. 2016) (citations omitted).

Relevantly, Section 5328(a) provides:

> (a) Factors.—In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant

_____

[3] 23 Pa.C.S.A. § 5338 relevantly provides that "[u]pon petition, a court may modify a custody order to serve the best interest of the child." 23 Pa.C.S.A. § 5338(a).

factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. § 5328(a).

Here, as indicated *supra*, the trial court set forth on the record at the conclusion of trial, as well as memorialized in an order filed on March 17, 2022, a complete analysis of the sixteen custody factors set forth in 23 Pa.C.S.A § 5328(a), making findings and discussing the evidence as to each of these findings. The trial court concluded that it was in B.T.M.'s best interest for the parties to share physical custody 50/50.

Mother now points to various facts and contends the trial court failed to consider and/or did not adequately consider the facts. We find Mother is not entitled to relief on this claim.

In analyzing the sixteen custody factors, contrary to Mother's assertion, the trial court specifically stated on the record it considered the allegations regarding Father's emotional instability, the lack of consistency in Father's work schedule, Father's angry outbursts, Father's desire to cease co-parenting counseling sessions, and Father's overnight work schedule. N.T., 3/14/22, 141-47.

Moreover, as it pertains to Mother's allegation regarding Father suffering from traumatic brain injury, the trial court noted that, although Dr. Pittman indicated it may be helpful for Father to have an evaluation to "rule out" traumatic brain injury, she never stated Father had such an injury. Trial Court

Opinion, filed 6/17/22, at 8. In any event, the trial court specifically stated it "considered and analyzed" the evidence related to Father possibly having a traumatic brain injury. *Id.*

Regarding Father permitting paternal grandfather, as opposed to Mother, to watch B.T.M. during Father's periods of custody, the trial court indicated "while there was significant time spent on evidence related to child-care arrangements, no one presented evidence that the child-care currently provided or previously provided was inappropriate." N.T., 3/14/22, at 145. The trial court determined it was not improper for paternal grandfather to watch the child. Trial Court Opinion, filed 6/17/22, at 10.

Regarding Father allegedly violating court orders, the trial court indicated it was not clear what orders and/or violations to which Mother was referring in her concise Rule 1925(a)(2)(i) statement. *Id.* at 9. In any event, testimony related to Father not following court recommendations or cooperating with co-parenting suggestions were "properly considered and given the proper weight during the analysis of the sixteen best interest factors." *Id.*

Regarding Father allegedly not taking the appropriate action to protect B.T.M. from contracting ringworm, the trial court noted:

> There was no medical evidence provided which substantiated the direct cause of the child's ringworm, and at the time of the hearing, the child was not suffering from ringworm….Therefore, the causal connection between the child's ringworm and the child's best interest in either household was glaringly missing. Furthermore, the fact the child was no longer

suffering from ringworm at the time of the hearing further watered down the relevance of this evidence….The evidence presented on the issue of ringworm was considered and ultimately it was determined that there was no substantial evidence that would cause a modification of the 50/50 custody schedule because of the child's past prolonged bouts of ringworm.

*Id.* at 10.

As is evident, the trial court carefully considered the evidence regarding B.T.M.'s history of ringworm, and we find no abuse of discretion in this regard.

In sum, in her first issue, Mother essentially asks this Court to override the credibility determinations of the trial court, reassess the evidence to credit her position, and re-weigh the factors to arrive at a different outcome. This we cannot do. We remind Mother that "parties cannot dictate the amount of weight the trial court places on evidence." *A.V.*, 87 A.3d at 829. It is axiomatic that the trial court is the arbiter of credibility, and this Court cannot interfere with the trial court's careful and thorough consideration of the best interests of the child with findings that are supported by the record. *See A.V.*, 87 A.3d at 820. Here, the trial court clearly considered the facts about which Mother complains and weighed them in considering the best interest of B.T.M. As the testimonial and documentary evidence support the trial court's determinations, we find no merit to Mother's first claim. *See id.*

In her second issue, Mother contends the trial court erred in questioning her about the identity of the person who contacted the Agency regarding B.T.M. sustaining a bruise and then using Mother's response in weighing the sixteen custody factors.

Initially, we note Mother has not set forth that place in the record where she objected to the trial court's questioning of her on this subject, and our review does not disclose an objection. Thus, Mother has waived for appeal her assertion that it was improper for the trial court to question her about the identity of the caller.[4] ***See*** Pa.R.A.P. 302(a)("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal"); ***V.B. v. J.E.B.***, 55 A.3d 1193 (Pa.Super. 2012) (applying Rule 302(a) in a child custody matter).

As it pertains to the trial court's consideration of Mother's testimony that maternal grandmother called the Agency after Mother provided her with a photo of the bruise, the trial court was free to analyze the testimony and weigh its value within the context of the sixteen custody factors. ***See A.V.***, ***supra***. The trial court found Mother's testimony surrounding the issue of the bruise lacked credibility. Trial Court Opinion, filed 6/17/22, at 11. The trial court specifically determined Mother's "action of sending texts and pictures of the trivial bruising to her own mother, who then contacted [the Agency], were properly considered as attempts to thwart the parent/child relationship between Father and child." ***Id.*** at 12. The trial court's factual findings are supported by the record and its inferences from Mother's testimony are

_____

[4] Further, Mother sets forth no relevant authority in her brief to support her contention that the trial court was not permitted to question her on this subject. ***See*** Pa.R.A.P. 2119 (setting forth requirements of the argument sections of appellate briefs).

reasonable. *See D.K.*, *supra*. Thus, we find no merit to Mother's second contention.

In her third issue, Mother contends the trial court failed to consider the parties' work schedules and availability prior to adopting the November 12, 2020, holiday custody schedule. Mother specifically contends the trial court failed to consider the fact that Father works in a casino and may not be available on certain holidays during which he has been awarded custody.

In addressing Mother's claim, the trial court relevantly indicated it considered the parties' work schedules in fashioning a holiday custody schedule. Trial Court Opinion, filed 6/17/22, at 12. The trial court specifically noted "the order provides the parties the opportunity to mutually agree to modify the holiday schedule and, based on credibility determinations made during the hearing, [the trial court] believes that Father will modify the holiday schedule appropriately when it conflicts with his work schedule." *Id.*

Contrary to Mother's claim, we conclude the trial court adequately considered the testimony concerning the parties' work schedules in adopting its previously imposed November 12, 2020, holiday custody schedule, and the trial court properly made credibility determinations with regard thereto. *See D.K.*, *supra*. The adoption of the holiday custody schedule by the trial court was made in light of and consideration of the overall custody determination of the trial court. Here, the trial court thoroughly and carefully considered the sixteen custody factors listed in 23 Pa.C.S.A. § 5328(a) in crafting the 50/50

shared physical custody arrangement. The holiday schedule adopted by the trial court, which provides for the parties to have the same periods of custody for major holidays on a rotating yearly basis, is consistent with those considerations and the trial court's focus on the best interests of B.T.M. We cannot conclude that the trial court's holiday custody schedule is unreasonable. *See A.V.*, *supra*.

In her fourth issue, Mother contends the trial court erred in failing to include in the custody order a provision of right of first refusal for Mother to care for the child. Mother specifically contends "Mother should be granted the right of first refusal while Father works, especially overnights and holidays." Mother's Brief at 49. She complains that paternal grandparents, who are not parties to this case, will benefit from time with B.T.M. when Father is working during his periods of custody with B.T.M.

Initially, we note that Mother has provided no relevant authority in her brief as to this issue. Mother's Brief at 49-50. Rather, Mother points to various aspects of testimony and baldly concludes "[t]he right of first refusal provision is in the child's best interest." *Id.* at 50.

In any event, the trial court explained its reasons for not including a right of first refusal provision as follows:

> Mother's next error identifies a failure to include a right of first refusal provision to allow Mother to exercise custody of the child when Father is working as opposed to him utilizing paternal grandparents as caretakers. Mother presented no evidence that the paternal grandparents were not appropriate child-care givers for the child. Mother also did not provide credible evidence that

Father's work schedule made him unable to be reasonably available to care for the child during his custodial periods. Therefore, the right of first refusal provision was unnecessary to promote the best interests of the child, and when implemented in prior orders, was always a major point of contention between the parties.

Trial Court Opinion, filed 6/17/22, at 12.

Contrary to Mother's suggestion, the trial court did not confer upon paternal grandparents any right to any period of custody when it denied Mother a right of first refusal. Rather, the trial court permitted Father, in his discretion, to utilize third parties, including paternal grandparents, to care for B.T.M. during his custodial time, if needed. Further, the trial court's decision was guided by B.T.M.'s best interests. The trial court focused on the conflict such a provision had previously added to the parties' contentious relationship. After a review of the record, we find no abuse of discretion. *See D.K.*, *supra*.

In her fifth and sixth issues, Mother challenges the trial court's analysis as it applies to factors one and eight of the sixteen custody factors set forth in 23 Pa.C.S.A. § 5328(a). Specifically, in her fifth issue, Mother contends that, as it relates to factor one, the trial court erred in finding she has a history of neither encouraging nor permitting frequent contact between Father and B.T.M. In her sixth issue, Mother contends that, as it relates to factor eight, the trial court erred in finding Mother has a history of thwarting the development of a strong, healthy relationship between Father and B.T.M. Mother contends there is no basis in the record for these findings, and, therefore, the trial court erred in ruling factors one and eight favored Father.

In addressing Mother's claims, the trial court relevantly indicated the following:

Mother disagrees with the court's credibility findings and weighing of the evidence related to best interest custody factors one and eight ("[w]hich party is more likely to encourage and permit frequent and continuing contact between the child and another party"; "[t]he attempts of a parent to turn the child against the other parent[.]"). Mother specifically testified that she disagreed with a 50/50 custody schedule because [B.T.M.] was only three years old and, when he is older, he may want to be with Father more but due to his current age he needed to be with her more. Regardless of whether Mother truly believes this to be true, Mother did not demonstrate that this…premise is in [B.T.M.'s] best interest. The 50/50 custody schedule has been in place for almost a year and a half at the time of the custody hearing, which was practically half of the child's life. Yet, Mother chooses to continue to push a false narrative that Father should not have his child fifty percent of the time because of the child's young age. There was no evidence to support such an assertion, and Mother's continuous refusal to acknowledge that [B.T.M.'s] needs are being met while in the care of Father results in her discouraging frequent contact and has inhibited Father's ability to develop a strong and healthy relationship with the child.

Trial Court Opinion, filed 6/17/22, at 12-13. Moreover, as it pertained to factor eight and Mother's attempts to thwart the development of Father's relationship with B.T.M., the trial court noted that "the recent [Agency] referral was clearly unnecessary and was a result of Mother disseminating pictures of a [minor] bruise to third parties." Trial Court Order, filed 3/17/22, Exhibit A.

Contrary to Mother's contention, the trial court's findings are supported by competent evidence of record, and we find no error in the trial court's inferences drawn therefrom. Simply put, the trial court's conclusions are

reasonable as shown by the evidence. ***D.K.***, ***supra***. Mother would have us override the trial court's credibility determinations and re-assess the evidence to credit her position; however, this is a task beyond our appellate purview. ***See A.V.***, ***supra***.

In her seventh issue, Mother contends the trial court placed too much emphasis on the testimony of Attorney DeLuca, who was the guardian *ad litem* for B.T.M. Specifically, she acknowledges that Attorney DeLuca testified the parties should have 50/50 physical custody; however, she contends Attorney DeLuca's testimony should have been given nominal weight since he had limited interaction with the child.

In response to Mother's claim, the trial court noted Attorney DeLuca has been involved with the custody case since September of 2020. Trial Court Opinion, filed 6/17/22, at 13. The trial court noted it primarily utilized Attorney DeLuca's testimony as it related to the custody factor involving whether the child had a well-reasoned preference of one parent over the other. ***Id.*** The trial court accepted Attorney DeLuca's testimony that, given B.T.M.'s young age, B.T.M. did not have a well-reasoned preference. ***Id.***

"On issues of credibility and weight of the evidence, we defer to the findings of the trial judge who has had the opportunity to observe the proceedings and demeanor of the witnesses." ***K.T. v. L.S.***, 118 A.3d 1136, 1159 (Pa.Super. 2015) (citation omitted). The trial court indicated it considered Attorney DeLuca's testimony as part of the court's best interest of

the child analysis. Trial Court Opinion, filed 6/17/22, at 13. We find no abuse of discretion in this regard.

In her remaining issues, eight through twelve, Mother challenges particular best interest custody factors. Specifically, in issue eight, Mother alleges the trial court erred in finding Father was more likely to maintain a loving, stable, consistent relationship with B.T.M. adequate for the child's needs. In issue nine, Mother alleges the trial court erred in finding Father is equally likely as Mother to attend to the daily physical, emotional, developmental, and education needs of B.T.M. In issue ten, Mother alleges the trial court erred in finding the proximity of the residences of the parties favors Father. In issue eleven, Mother alleges the trial court erred in finding Father is equally available to care for B.T.M. or make appropriate child-care arrangements. In issue twelve, Mother alleges the trial court erred in finding the mental and physical conditions of the parents were equal. We conclude Mother is not entitled to relief on these issues.

Initially, we note that Mother has set forth no relevant authority in support of her issues eight through twelve. *See* Mother's Brief at 54-61. Rather, she discusses portions of testimony and baldly avers the trial court erred in its credibility determinations and/or the weight placed upon the testimony. *Id. See* Pa.R.A.P. 2119 (setting forth requirements of the argument sections of appellate briefs).

In any event, the trial court examined Mother's issues and explained as follows:

> Based upon the credited testimony and evidence presented, Mother took pictures of the child's minor bruise following Father's period of custody and disseminat[ed] [the photo] to third parties causing unnecessary alarm and [an] unsubstantiated child abuse investigation. This demonstrates a striking departure from a stable and nurturing environment consistent with meeting a child's emotional needs. Similarly, the credited testimony did not demonstrate that Father was incapable of meeting the child's daily needs despite her unsupported conclusions to the contrary. Mother acknowledged during her testimony that she moved further away from Father. Although it was not a substantially significant distance from her prior residence, that she moved and then failed to inform Father about her move [in a timely fashion], resulted in the finding that the factor related to the proximity of the residences of the parties favors Father. As discussed in the custody factor pertaining to each party's availability to care for the child or make appropriate child-care arrangements, while Mother may not like Father's work schedule, as she has had a more flexible work schedule since the [Covid-19] pandemic, there was a complete lack of evidence that Father's child-care arrangements were inappropriate. The credited testimony and evidence demonstrated that Father makes the most of his custodial time and despite his work requiring odd hours and travel, the caretaking arrangements he has in place are appropriate. Finally, it is abundantly clear that there is no such thing as a perfect parent. Father and Mother have imperfections as parents and a good majority of those can be distinctly tied to their inability to co-parent. There was no question both parents love and care and want the best for their child. When all the evidence was weighed, the mental and physical condition of each party's household was equal[.]

Trial Court Opinion, filed 6/17/22, at 14-15.

We find no abuse of discretion or error of law. We conclude the trial court's findings are supported by the record, and the trial court's inferences made therefrom are reasonable. **See D.K.**, **supra**.

We note that Mother's issues are largely grounded in her theory that it is always in a three-year-old child's best interests to be primarily in the custody of the mother, as well as her theory that Father should give up custodial time solely because he works. However, this jurisdiction has rejected such theories. *See Johnson v. Lewis*, 870 A.2d 368 (Pa.Super. 2005) (holding a parent's work schedule may not deprive a parent of custody if suitable arrangements are made for the child's care in the parent's absence); 23 Pa.C.S.A. § 5328(b) ("In making a [custody] determination under subsection (a), no party shall receive preference based upon gender in any award granted under this chapter.").

In conclusion, we hold that, in fashioning its shared custody order, the trial court carefully considered the sixteen custody factors set forth in Subsection 5328(a) with the paramount concern being the best interests of B.T.M. *See Saintz v. Rinker*, 902 A.2d 509 (Pa.Super. 2006). "Common sense dictates that trial courts should strive, all other things being equal, to assure that a child maintains a healthy relationship with both of his…parents, and that the parents work together to raise their child." *S.C.B. v. J.S.B.*, 218 A.3d 905, 916 (Pa.Super. 2019).

Based on the aforementioned, we affirm the trial court's March 17, 2022, custody order.

Affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 2/15/2023